## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Noel Davila, | Case No. 20-cv-150 (JRT/LIB) |
| Plaintiff, | |
| v. | **ORDER AND**<br>**REPORT AND RECOMMENDATION** |
| United States, et al., | |
| Defendants. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provision of 28 U.S.C. § 636, and upon Plaintiff's Application to Proceed in forma pauperis (hereinafter "IFP"). [Docket No. 2].

Plaintiff's IFP Application, [Docket No. 2], is **GRANTED**. For the reasons further contained herein, the Court recommends that Plaintiff's Complaint, [Docket No. 1], be **DISMISSED**, in its entirety, for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

### I.      Background and Procedural History

Plaintiff Noel Davila ("Plaintiff") is presently incarcerated at FCI Butner, and he was previously incarcerated at FMC Rochester until February 5, 2019. (Compl. [Docket No. 1], at 3, 15). Plaintiff is paraplegic and requires the use of a wheelchair. (Id. at 8). Plaintiff has several additional medical conditions. (See, e.g., Id. at 15). Plaintiff contends that he was the subject of a conspiracy by Defendants to have him sent away from FMC Rochester because Plaintiff had filed several administrative complaints against Defendants. In the course of the conspiracy, Plaintiff alleges that Defendants violated Plaintiff's constitutional rights and committed various torts against him. (See, Compl. [Docket No. 1]).

In early 2017, while Plaintiff was incarcerated at FMC Rochester, he filed administrative complaints against Defendant Woltman and other prison staff. (Id. at 15). Shortly thereafter, on March 11, 2017, a shank was found in Plaintiff's locker. (See, Id. at 15–16). Plaintiff was brought to segregation. (Id.). Plaintiff contends he was set up by his cellmate, and he asserts that his case was sent directly to the Regional DHO where Plaintiff was found not guilty. (Id. at 16). Plaintiff spent about 12 days in segregation. (Id.).

Between then and September 24, 2018, Plaintiff filed "numerous [administrative] complaints" against Defendant Woltman regarding her demeanor which Plaintiff describes as "very abusive, intimidating, and threatening," as well as, administrative complaints alleging "racial discrimination" and "unequal treatment" due to the Spanish-language television being locked and there only being one Spanish language television channel available to inmates at FMC Rochester. (Id. at 8, 20; see gen., Exhibits [Docket No. 1-1], at 14–65).

On September 24, 2018, Plaintiff was in his cell with inmate Ricardo Andino Nieves when inmate Ernesto Olivo ("Olivo") entered. (Compl. [Docket No. 1], at 8). Olivo, who also is paraplegic and requires a wheelchair, removed the handle of his wheelchair and swung it at Plaintiff's head. (Id.). Plaintiff blocked the blow with his left hand and broke his finger in the process. (Id.). Plaintiff then "defended himself" and a physical altercation between Plaintiff and Olivo ensued. (Id.).

Also on September 24, 2018, following the altercation, Plaintiff was evaluated by medical staff, and he reported that "an injury happened in his cell while lifting weights." (Id. at 8–9; Exhibits [Docket No. 1-1], at 120–22). Defendant Dr. York cosigned a medical report, completed by Lori Clark RN, that indicated Plaintiff's left hand was red but not swollen and his left ring finger was discolored, as well as, that Plaintiff had full movement of his hand, Plaintiff reported

the discoloration was due to lifting weights, and Plaintiff reported chronic pain but no new pain. (Exhibits [Docket No. 1-1], at 120–22).

Approximately 3 or 4 days later, Plaintiff was informed by Defendant Woltman that Olivo had accused Plaintiff of assaulting him. (Compl. [Docket No. 1], at 9). Plaintiff told Defendant Woltman that Olivo had actually assaulted Plaintiff because Plaintiff had approached Olivo and told him not to abuse and take advantage of other inmates. (Id.). Plaintiff also told Defendant Woltman that he believed his finger was broken and that he needed medical treatment. (Id.). After Defendant Woltman informed Plaintiff that she was going to refer the incident to the DHO Committee, Plaintiff requested that Defendant Woltman provide him with evidence regarding the allegations such as videos and reports. (Id.). Defendant Woltman told Plaintiff that he would find out about the incident on "the DHO committee day." (Id.). Defendant Woltman did not notify medical staff of Plaintiff's broken finger. (Id.).

Subsequently, "Plaintiff requested an advocate investigator to help him on his behalf to prepare for his case." (Id.). Plaintiff was assigned Defendant S. Snyder as his case manager and advocate investigator." (Id.).

Plaintiff alleges that he was placed in segregation on September 24, 2018,[1] and he remained in segregation until his transfer to FCI Butner on February 5, 2019. (See, Id. at 15). Plaintiff asserts that he suffers from several medical ailments which require him to wear pull-ups and to use catheters, gloves, and other "medical articles" at all times "to keep himself clean." (Id.). Plaintiff alleges that "on a regular basis" while he was in segregation, "his pull-ups, catheters, gloves, and other medical supplies were confiscated [and] taken by" unidentified officers, and he was left "to

---

[1] The Court notes that Plaintiff's timeline of events is somewhat illogical and contradictory due to his allegations that Defendant Woltman informed him of Olivo's assault allegations 3 or 4 days after September 24, 2018. However, this inconsistency is not relevant to the matters presently before the Court.

defecate and urinate on himself." (<u>Id.</u>). Plaintiff further alleges that he was only allowed to change his blankets and sheets once a week, and he was only allowed access to showers on Mondays, Wednesdays, and Fridays, "leaving Plaintiff to fill with urine and feces" and to "sleep without anything or to sleep with it . . . full of urine and feces smells." (<u>Id.</u>).

At some point between September 24, 2018, and his DHO Hearing on December 7, 2019, Plaintiff alleges that he wrote Defendants Paul, Woltman, Snyder, Grimsley, and Yargus to provide them with a description of the incident. (<u>Id.</u> at 9–10). Defendant Yargus met with Plaintiff and took his "version of the facts of the alleged assault or altercation." (<u>Id.</u> at 10). And Plaintiff wrote to Defendants Paul, Snyder, Woltman, Grimsley, Yargus, and other unidentified DHO investigators for a "description of the incident containing all allegations known against the Plaintiff," as well as, "any exculpatory evidence such as video or audio surveillance, statements, supp[orting] incident reports etc. to prepare his defense." (<u>Id.</u>).

Also at some point between September 24, 2018, and his DHO Hearing on December 7, 2019, Plaintiff "filed numerous [administrative] complaints" against Defendant Woltman and other officers "for harassment, retaliation, and staff misconduct." (<u>Id.</u>). And "Plaintiff . . . filed numerous requests to be see[n] by the medical department . . . to attend to his broken finger." (<u>Id.</u>).

Plaintiff further alleges that at some point between September 24, 2018, and his DHO Hearing on December 7, 2019, an Officer John Doe informed him that "plaintiff was placed on the transfer list to leave" FMC Rochester. (<u>Id.</u> at 10). Defendant Grimsley told Plaintiff that he was "not coming out of segregation." (<u>Id.</u>). And Defendant Yargus told Plaintiff that "it does not really matter anymore" because he was "already designated to leave the prison to Butner." (<u>Id.</u> at 11).

On October 29, 2018, Plaintiff was evaluated by medical staff regarding his injured finger. (Exhibits [Docket No. 1-1], at 123–24). Defendant Dr. York consigned a medical report, completed

by Karin Parsons PA-C, that indicated Plaintiff had asked to have his finger evaluated that morning, Plaintiff said the injury had occurred a month earlier but could not provide a date or time, and Plaintiff would not say what happened when asked and just repeated "[t]hey know what happened." (Id.). The medical report noted that Plaintiff "did not cooperate with [the] exam." (Id.). Plaintiff was seen for X-rays and follow-up examinations on October 31, 2018, November 1, 2018, November 2, 2018, November 27, 2018, and December 3, 2018. (Id. at 125–34).

On December 6, 2018, Plaintiff was seen by an orthopedic specialist who recommended surgery, and surgery on Plaintiff's finger was set to be scheduled "by the end of the year." (Compl. [Docket No. 1], at 11; see also, Exhibits [Docket No. 1-1], at 135–44).

On December 7, 2018, a DHO Hearing was held regarding the alleged assault of Olivo by Plaintiff. (Compl. [Docket No. 1], at 11–12). Plaintiff asserts that he "was caught by surprise" when Defendant DHO Hearing Officers S. Boldt and L. Dohluar read Plaintiff the specific details of Olivo's allegations and described new witnesses. (Id.). Plaintiff also asked why he was not provided with exculpatory evidence, and Defendant S. Boldt stated he was "not entitled to any of these [sic] evidence." (Id. at 12). In addition, Plaintiff alleges that he was not allowed to introduce medical documents regarding his injured finger or the various administrative complaints that he had filed previously. (Id. at 12–13). Plaintiff did provide a statement from another inmate, Edward Collier, stating that Olivo had assaulted Collier in a previous, unrelated incident. Nevertheless, Plaintiff alleges that Defendants "ignored and disregarded" this "important evidence." (Id. at 13). Plaintiff was found guilty of assaulting Olivo. (See, e.g., Id. at 12–14).

The Hearing Officer Report indicates that inmate Ricardo Andino was a witness on Plaintiff's behalf and that Ricardo Andino stated, "I don't know anything about what happened between [Plaintiff] Davila and Olivo." (Exhibits [Docket No. 1-1], at 70; see also, Compl. [Docket

No. 1], at 13). However, Plaintiff alleges that his witness Ricardo Andino did not appear at Plaintiff's DHO Hearing and that Defendants "lied on their Discipline Hearing Officer Report." (Compl. [Docket No. 1], at 13, 30). Plaintiff further alleges that on the day before his DHO Hearing, December 6, 2018, while Plaintiff was returning from a medical appointment and on his way to segregation, he spoke with Ricardo Andino who purportedly told Plaintiff that he stated he did not know what happened because Defendant Woltman had threatened him. (Id. at 13–14).

Plaintiff alleges that in late December, he was woken up and told to get ready to be taken to the hospital for surgery. (Id. at 18). About a half hour later, Plaintiff was informed that his surgery had been cancelled. (Id.).

On January 9, 2019, Plaintiff was evaluated by Defendant Dr. York, who noted that Plaintiff's finger was "the same" and that Plaintiff was "waiting for surgery on it." (Exhibits [Docket No. 1-1], at 149).

On February 5, 2019, Plaintiff was transferred to FCI Butner.[2] (Compl. [Docket No. 1], at 15). As of the filing of Plaintiff's Complaint, he had not received surgery on his broken finger. (Id.).

On January 10, 2020, Plaintiff initiated this case by filing a Complaint and seeking to proceed in forma pauperis. Plaintiff asserts claims under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1978), the Federal Tort Claims Act ("FTCA"), and 42 U.S.C. § 1985 and § 1986. (See, e.g., Id. ¶¶ 1, 3). Plaintiff attached 168 pages of documents to his Complaint in support of his claims. (Exhibits [Docket No. 1-1]). Plaintiff names as Defendants in their official and individual capacities: (1) the United States; (2) David Paul, the Warden of FMC Rochester; (3) J.

---

[2] In his Complaint, Plaintiff asserts several allegations regarding the purported conditions at FCI Butner. However, such allegations are not relevant to the claims asserted against Defendants in the present case. (See, Compl. [Docket No. 1]).

Yargus, an SIS Investigator at FMC Rochester; (4) Mr. Grimsley, an SIS Investigator at FMC Rochester; (5) Rhonda Woltman, a counselor at FMC Rochester; (6) S. Boldt, a disciplinary hearing officer and investigator at FMC Rochester; (7) L. Dohluar, a disciplinary hearing officer and investigator at FMC Rochester; (8) S. Snyder, a case manager at FMC Rochester; (9) Dr. Sheila Hadaway, DO, a clinical director at FMC Rochester; and (10) Dr. Elaine York, MD, a medical doctor at FMC Rochester. (Compl. [Docket No. 1], at 3–7). Plaintiff seeks monetary, injunctive, and declaratory relief. (Id. at 34–41).

In a February 5, 2020, Order, the Court informed Plaintiff that this action will not go forward until Plaintiff's initial partial filing fee has been paid in full, and the Court directed Plaintiff, if he wishes to proceed, to pay the initial partial filing fee that 28 U.S.C. § 1915(b) requires of prisoner inmates proceeding pro se. (Order [Docket No. 3], at 2–3). However, the Court warned Plaintiff that "[u]pon initial review it appears some of the claims he presents may not be sustainable as pled," and the Court informed Plaintiff that if he elected to pursue this action through paying the initial partial filing fee, he will have to pay this action's entire filing fee regardless of the outcome of the present action. (Id. at 3 & n.2).

Plaintiff has now paid the initial partial filing fee, and therefore, Plaintiff's IFP Application, [Docket No. 2], is now properly before the Court for consideration. Despite the warning regarding the claims raised in his Complaint, Plaintiff has to date made no efforts to amend his Complaint.

## II.    Analysis

As noted above, Plaintiff has now paid the initial partial filing fee as directed by the Court, and therefore, his IFP Application, [Docket No. 2], is now before this Court for consideration. Upon review of Plaintiff's IFP Application, [Docket No. 2], the Court concludes that Plaintiff qualifies financially for IFP status and grants his IFP Application.

However, even a successful IFP applicant's suit faces screening under 28 U.S.C. § 1915(e)(2)(B)(ii). A court will dismiss such a suit when it fails to state a cause of action on which relief may be granted. <u>See</u>, <u>Carter v. Schafer</u>, 273 Fed. App'x 581, 582 (8th Cir. 2008) (per curiam); <u>Atkinson v. Bohn</u>, 91 F.3d 1127, 1128 (8th Cir. 1996) (per curiam).

**A.  Screening Standards**

When reviewing whether a complaint states a claim on which relief may be granted, this Court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. <u>See</u>, <u>Aten v. Scottsdale Ins. Co.</u>, 511 F.3d 818, 820 (8th Cir. 2008). The complaint's factual allegations need not be detailed, but they must be enough to "raise a right to relief above the speculative level . . . ." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." <u>Id.</u> at 570. In assessing a complaint's sufficiency, the court may disregard legal conclusions couched as factual allegations. <u>See</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).

Furthermore, under Federal Rule of Civil Procedure 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

Pro se complaints are to be construed liberally, however, even pro se complaints must still allege sufficient facts to support the claims advanced. <u>See, e.g.</u>, <u>Stone v. Harry</u>, 364 F.3d 912, 914 (8th Cir. 2004); <u>Solomon v. Petray</u>, 795 F.3d 777, 787 (8th Cir. 2015); <u>Dunn v. White</u>, 880 F.2d 1188, 1197 (10th Cir. 1989) (regarding a pro se plaintiff, "we will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts that have not been pleaded"); <u>Cunningham v. Ray</u>, 648 F.2d 1185, 1186 (8th Cir. 1981) ("[P]ro se litigants must set [a claim] forth in a manner which, taking the pleaded facts as true, states a claim as a matter of law."). "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from

8

failing to comply with substantive and procedural law." Burgs v. Sissel, 745 F.2d 526, 528 (8th Cir. 1984); see also, Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004).

### A. Plaintiff's Bivens Claims

"A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors." Aldaco v. Holder, No. 10-cv-590 (JRT/LIB), 2011 WL 825624, at *3 (D. Minn. Jan. 7, 2011), report and recommendation adopted by 2011 WL 839388 (D. Minn. Mar. 7, 2011) (citing Bivens, 403 U.S. at 395–97). "A Bivens claim allows a plaintiff to bring an action for money damages against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under color of federal law." Id. at *3. A Bivens claim can only be maintained against a government employee in his individual capacity; Bivens does not authorize claims against government employees in their official capacities. Bivens v. Siv Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 396–97 (1971).

Here, Plaintiff alleges that Defendants violated his rights under the First, Fifth, Eighth, and Fourteenth Amendments. (See, Compl. [Docket No. 1]). Plaintiff's Complaint, when liberally construed in his favor, alleges the following Bivens claims: (1) retaliation for filing administrative complaints in violation of the First Amendment; (2) denial of procedural due process regarding Plaintiff's DHO Hearing in violation of the Fifth and Fourteenth Amendments; and (3) deliberate indifference to Plaintiff's medical needs in violation of the Eighth Amendment.[3] (See, Id.).

---

[3] Although Plaintiff periodically refers to racial discrimination and equal protection violations in his Complaint, he always does so in a historical context while referring to the past administrative complaints that he filed. (See, e.g., Compl. [Docket No. 1], at 8, 20). In the present case, Plaintiff alleges that his First Amendment rights were violated when Defendants retaliated against him for filing those past racial discrimination and equal protection administrative complaints. (See, e.g., Id.). However, even in liberally construing Plaintiff's Complaint in his favor, Plaintiff does not assert any constitutional racial discrimination or equal protection claims in the present case.

###### i.    Sovereign Immunity

"Sovereign immunity is a jurisdictional doctrine, and the terms of the United States'
consent to be sued in any court define that court's jurisdiction to entertain the suit." Brown v.
United States, 151 F.3d 800, 803–04 (8th Cir. 1998). As a sovereign power, the United States may
be sued only to the extent that it has consented to suit by statute. United States Dept. of Energy v.
Ohio, 503 U.S. 607, 615 (1992). Therefore, sovereign immunity holds that the United States, and
its agencies and instrumentalities, including the Bureau of Prisons ("BOP"), are immune from suit,
unless a waiver of such immunity has been "expressed unequivocally" by Congress. Manypenny
v. United States, 948 F.2d 1057, 1063 (8th Cir. 1991).

In the present case, Plaintiff names the United States as a Defendant. Moreover, Plaintiff
asserts claims against the individual Defendants in both their individual and official capacities.
The United States is the real party interest in claims brought against the individual Defendants in
their official capacities. See, Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Congress has not waived the sovereign immunity of the United States Government, or its
agencies, for claims that their employees have violated the Constitution. Bivens, 403 U.S. at 410;
Buford v. Runyon, 160 F.3d 1199, 1203 (8th Cir. 1998). A Federal prisoner may bring a Bivens
claim against an officer individually, subject to the defense of qualified immunity, but "[t]he
prisoner may not bring a Bivens claim against the officer's employer, the United States, or the
BOP . . . [because] his only remedy lies against the individual," with respect to the alleged
constitutional deprivation. Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001).

Accordingly, this Court recommends that Plaintiff's Bivens claims against Defendant
United States, as well as, Plaintiff's Bivens claims against the individual Defendants in their
official capacities be **DISMISSED** for lack of subject matter jurisdiction.

ii.    **Plaintiff's Retaliation and Due Process Claims**

Plaintiff asserts that Defendants violated his First Amendment rights when they retaliated against him for filing administrative complaints. (See, Compl. [Docket No. 1]). Specifically, Plaintiff alleges that he filed several administrative complaints in reference to purported unequal treatment and discrimination against Hispanic inmates due to the Spanish-language television being locked and there only being one Spanish channel, as well as, several administrative complaints regarding the conduct of Defendant Woltman and other officers. (See, Id.). Plaintiff further alleges that Defendants retaliated against him for filing said administrative complaints by harassing Plaintiff, refusing to give Plaintiff a single-man room, repeatedly searching Plaintiff's room and locker, falsely accusing Plaintiff of having a shank in his locker, denying Plaintiff due process during his DHO Hearing on Olivo's assault allegations, denying Plaintiff medical supplies and treatment, and by transferring Plaintiff out of FMC Rochester. (See, Id.). Plaintiff also asserts that Defendants violated his Fifth and Fourteenth Amendment rights when they denied him due process during his DHO Hearing on Olivo's assault allegations. (See, Id.). For the reasons below, this Court finds that these are not cognizable Bivens claims.

The United States Supreme Court's decision in Bivens "established that the victims of a constitutional violation by a federal agent have a right to recover damages against [that] official in federal court despite the absence of any statute conferring such a right." Carlson v. Green, 446 U.S. 14, 18 (1980). In recent years, however, the Supreme Court has made clear that the cause of action established by Bivens does not extend to all claims of constitutional violations. See, e.g., Hernandez v. Mesa, 140 S. Ct. 735 (2020) (discussing the very narrow acceptance of newly recognized categories of Bivens claims); Ziglar v. Abbasi, 137 S. Ct. 1843 (2017) (same). The Supreme Court has previously recognized under Bivens claims brought for excessive force in

11

violation of the Fourth Amendment, see, Bivens, 403 U.S. at 388, workplace discrimination in violation of the Fifth Amendment, see, Davis v. Passman, 442 U.S. 228 (1979), and deliberate indifference to a serious medical need in violation of the Eighth Amendment. See, Carlson, 446 U.S. at 14. Recently, in Ziglar, the Supreme Court went to great lengths to emphasize that it had not expanded this limited scope of claims available under Bivens in 30 years, and that a circumstance that warranted further expansion at this juncture would be rare. Ziglar, 137 S. Ct. at 1857.

"Determining whether an implied cause of action is available under Bivens involves two steps." Farah v. Weyker, 926 F.3d 492, 498 (8th Cir. 2019). "First, we must determine whether the cases before us present one of 'the three Bivens claims the Court has approved in the past' or whether, instead, allowing the plaintiffs to sue would require us to extend Bivens to a 'new context.'" Id. (quoting Ziglar, 137 S. Ct. at 1857). A context is regarded "as 'new' if it is 'different in a meaningful way from previous Bivens cases decided by [the U.S. Supreme] Court.'" Hernandez, 140 S. Ct. at 735 (quoting Ziglar, 137 S. Ct. at 1859).

"If there is a previously recognized Bivens claim alleged, then the cases may proceed. If not, then we advance to the second step and ask whether any 'special factors counsel[] hesitation' before implying a new cause of action 'in the absence of affirmative action by Congress.'" Farah, 926 F.3d at 498 (alteration in original) (quoting Ziglar, 137 S. Ct. at 1857). "Only if we are confident that 'the Judiciary is well suited . . . to consider and weigh the costs and benefits of allowing a damages action' will we take it upon ourselves to do so. Otherwise, we will leave the balancing to Congress." Id. (alteration in original) (quoting Ziglar, 137 S. Ct. at 1858).

Here, Plaintiff alleges that his First Amendment rights were violated, as well as, his procedural due process rights under the Fifth and Fourteenth Amendment. These are not Bivens

claims that have been approved by the U.S. Supreme Court in the past. Indeed, the U.S. "Supreme Court has never recognized a <u>Bivens</u> remedy for First Amendment claims, and it has affirmatively declined to extend <u>Bivens</u> to a claim invoking the First Amendment." <u>Brown v. Cooper</u>, No. 18-219 (DSD/BRT), 2018 WL 6977594, at *12 (D. Minn. Dec. 11, 2018), report and recommendation adopted by 2019 WL 121943 (D. Minn. Jan. 7, 2019), <u>aff'd</u>, 787 Fed. App'x 366 (8th Cir. 2019); <u>see also</u>, <u>Ziglar</u>, 137 S. Ct. at 1857 (providing examples of cases where the Court has declined to recognize <u>Bivens</u> claims); <u>Reichle v. Howards</u>, 566 U.S. 658, 663 n.4 (2012) (noting that the U.S. Supreme Court "ha[s] never held that <u>Bivens</u> extends to First Amendment Claims"). Likewise, the U.S. Supreme Court has never recognized a <u>Bivens</u> remedy for <u>procedural</u> due process claims, and it has affirmatively "declined to extend <u>Bivens</u> to [procedural] due process claims." <u>See</u>, <u>Reagan v. Rendon</u>, No. 4:19cv00152-KGB-JJV, 2019 WL 7985351, at *2–3 (E.D. Ark. July 8, 2019); <u>see also</u>, <u>Ziglar</u>, 137 S. Ct. at 1857 (providing examples of cases where the Court has declined to recognize <u>Bivens</u> claims). Therefore, Plaintiff's retaliation and procedural due process claims would require extending <u>Bivens</u> to a new context. <u>See</u>, <u>Farah</u>, 926 F.3d at 498.

Accordingly, this Court must proceed to the second step and determine "whether any 'special factors counsel[] hesitation' before implying a new cause of action 'in the absence of affirmative action by Congress.'" <u>Farah</u>, 926 F.3d at 498 (alteration in original) (quoting <u>Ziglar</u>, 137 S. Ct. at 1859). "[R]ecognizing the [U.S. Supreme] Court's 'caution' in this regard, [the Eighth Circuit] ha[s] adopted a 'presumption against judicial recognition of direct action for violations of the Constitution by federal officials.'" <u>Id.</u> at 500. (quoting <u>Neb. Beer, Ltd. v. Greening</u>, 398 F.3d 1080, 1084 (8th Cir. 2005)).

Here, this Court finds that there are special factors that counsel hesitation before extending <u>Bivens</u> under the present circumstances. Plaintiff's retaliation and procedural due process claims

13

implicate BOP policies regarding grievances, medical treatment, disciplinary proceedings, and inmate transfer. See, Brown, 2018 WL 6977594, at *13. "BOP officials faced with the expanded possibility of personal liability may act differently with respect to these issues when dealing with inmates in BOP custody," and "[a]s explained in Ziglar, Courts should consider defense costs created by claims against federal officials, Congress' 'substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government,' and 'the time and administrative costs attendant upon intrusions resulting from the discovery and trial process.'" Id. (quoting Ziglar, 137 S. Ct. at 1856). Moreover, "Congress . . . passed the [Prisoner Litigation Reform Act] to reduce the number of frivolous prisoner lawsuits," and its "restrictive provisions with respect to prisoner litigation are a special factor counseling hesitation when deciding whether to create a new cause of action for prisoners." Id.

Therefore, this Court finds that Bivens should not be extended to Plaintiff's retaliation and procedural due process claims. See, e.g., Reagan, 2019 WL 7985351, at *3 (declining to extend Bivens to a due process claim arising out of disciplinary proceedings at a federal correctional institution); Brown, 2018 WL 6977594, at *13 (declining to extend Bivens to a claim that the plaintiff had been retaliated against "for filing administrative remedy grievances in violation of the First Amendment" while at FMC Rochester).

Accordingly, this Court recommends that Plaintiff's Bivens claims alleging retaliation and procedural due process violations should be **DISMISSED** for failure to state a claim upon which relief can be granted.

14

### iii.    Plaintiff's Deliberate Indifference to Medical Needs Claims

Plaintiff asserts that Defendants violated his Eighth Amendment rights when they were deliberately indifferent to his medical needs. (See, Compl. [Docket No. 1]). In liberally construing Plaintiff's Complaint, he makes four claims of deliberate indifference. First, Plaintiff claims that Defendants were deliberately indifferent to his medical needs because although his hand was examined on September 24, 2018, Defendants did not provide him with treatment for his broken finger until October 29, 2018. (See, Compl. [Docket No. 1]). Second, Plaintiff claims that Defendants were deliberately indifferent to his medical needs because his pull-ups, catheters, gloves, and other medical supplies were confiscated while he was in segregation. (See, Id.). Third, Plaintiff claims that Defendants were deliberately indifferent to his medical needs because they did not provide him with surgery on his broken finger before he was transferred to FCI Butner. (See, Id.). Fourth, Plaintiff claims that Defendants were deliberately indifferent to his medical needs because they transferred him and/or allowed him to be transferred to FCI Butner, which Plaintiff contends is ill-equipped to treat his medical conditions. (See, Id.).

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishment" on persons convicted of crimes. See, Rhodes v. Chapman, 425 U.S. 337, 344–46 (1981). Any "deliberate indifference to serious medical needs of prisoners" constitutes cruel and unusual punishment, and therefore, violates the Eighth Amendment "because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotations and citation omitted); see also, Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000) ("It is well established that the Eighth Amendment prohibition on cruel and unusual punishment

extends to protect prisoners from deliberate indifference from serious medical needs.") (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

"Whether an official was deliberately indifferent requires both an objective and a subjective analysis." Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014). To demonstrate the "deliberate indifference" necessary for pleading an Eighth Amendment violation, a prisoner must show: (1) that he had an objectively severe medical need; and (2) that prison officials subjectively knew of, but deliberately disregarded, that need. Id.; accord, Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)). "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured "by reference to the *effect* of delay in treatment.""" Laughlin v. Shriro, 430 F.3d 927, 929 (8th Cir. 2005) (emphasis in original).

"Deliberate indifference is akin to criminal recklessness." Drake v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006). Accordingly, a plaintiff must plead "more than negligence, more even than gross negligence." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Flores v. United States, 689 F.3d 894, 903 (8th Cir. 2012) (quoting Holden, 663 F.3d at 341) ("Deliberate indifference includes something more than negligence but less than actual intent to harm, it requires proof of a reckless disregard of the known risk."). "Specifically, the prisoner must show both (1) that a prison official had actual knowledge that the prisoner's medical condition created a substantial risk of serious harm to the prisoner's health, and (2) that the prison official failed to act reasonably to abate that risk." Baez v. Rosemack, No. 9-cv-2121 (RHK/LIB), 2011 WL 4062586,

at *4 (D. Minn. Aug. 9, 2011) (citing <u>Coleman</u>, 114 F.3d at 785), report and recommendation adopted, 2011 WL 4067466 (D. Minn. Sept. 13, 2011), <u>aff'd</u>, 471 Fed. App'x 544 (8th Cir. 2012).

As noted above, the U.S. Supreme Court has previously recognized a <u>Bivens</u> claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment. <u>See</u>, <u>Carlson</u>, 446 U.S. at 14. Therefore, a <u>Bivens</u> cause of action is available for Plaintiff's deliberate indifference to medical needs claims. <u>See</u>, <u>Farah</u>, 926 F.3d at 498.

First, Plaintiff claims that Defendants were deliberately indifferent to his medical needs because although they examined his hand on September 24, 2018, they did not provide him with any treatment for his broken finger until October 29, 2018. (<u>See</u>, Compl. [Docket No. 1]). However, Plaintiff does not assert any allegations of personal involvement by Defendants David Paul, J. Yargus, Mr. Grimsley, S. Boldt, L. Dohluar, S. Snyder, or Dr. Sheila Hadaway, DO. (<u>See</u>, <u>Id.</u>). Nor has Plaintiff asserted any allegations from which it can be plausibly inferred that these Defendants had actual knowledge that Plaintiff's finger was broken prior to October 29, 2018. (<u>See</u>, <u>Id.</u>).

Although Plaintiff generically alleges that he "filed numerous requests to be see[n] by the medical department" regarding his broken finger, Plaintiff does not allege that any of his requests were known to these Defendants. (<u>See</u>, <u>Id.</u>). Because Plaintiff has not plausibly alleged that these Defendants had actual knowledge that Plaintiff's finger was broken prior to October 29, 2018, Plaintiff has failed to state a claim against these Defendants.[4] <u>See, e.g.</u>, <u>Jackson</u>, 756 F.3d at 1065; <u>Jolly</u>, 205 F.3d at 1096; <u>Baez</u>, 2011 WL 4062586, at *4.

---

[4] Plaintiff does allege that Defendant David Paul, as warden, was in charge of prisoner's medical appointments and treatments and also that Defendant Sheila Hadaway, DO, as clinical director, was responsible for ensuring medical care was provided to prisoners. (Compl. [Docket No. 1], at 3, 6). However, "<u>Bivens</u> liability cannot be established solely on a theory of respondeat superior." <u>Webb v. Hedrick</u>, 409 Fed. App'x 33, 35 (8th Cir. 2010); <u>see also</u>, <u>Clemmons v. Armentrout</u>, 477 F.3d 962, 967 (8th Cir. 2007) (quoting <u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987) (alteration in original) ("[A] warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement."); <u>Ricketts v. Maggard</u>, No. 19-cv-00276 (WMW/HB), 2019 WL

In reference to Defendant Dr. Elaine York, MD, Plaintiff alleges that she was aware of his injury on September 24, 2018, because she cosigned a medical report on that day. (See, e.g., (Compl. [Docket No. 1], at 22; see also, Exhibits [Docket No. 1-1], at 120–22). However, said medical report does not indicate that Plaintiff's finger was broken. (See, Exhibits [Docket No. 1-1], at 120–22). Rather, it indicates that Plaintiff reported "an injury happened in his cell while lifting weights," as well as, that Plaintiff's left hand was red but not swollen, his left ring finger was discolored, and he had full movement of his hand. (See, Id.). The medical report further indicates that Plaintiff reported the discoloration was due to lifting weights, and that Plaintiff denied any symptoms and reported chronic pain but no new pain. (See, Id.). Plaintiff alleges that he misrepresented how his injury occurred because he believed "Olivo's [sic] was not going to say anything." (Compl. [Docket No. 1], at 9).

Given that Plaintiff affirmatively misrepresented his injury to medical personnel during the September 24, 2018, medical evaluation and that none of the allegations in Plaintiff's Complaint nor the documents attached to his Complaint indicate it was actually discovered that Plaintiff's finger was broken at that time, Plaintiff has failed to plausibly allege that Defendant Dr. Elaine York, MD had actual knowledge of Plaintiff's injury prior to October 29, 2018. Therefore, Plaintiff has failed to state a claim against Defendant Dr. Elaine York, MD. See, Jackson, 756 F.3d at 1065; Jolly, 205 F.3d at 1096; Baez, 2011 WL 4062586, at *4; see also, Estelle v. Gamble, 429 U.S. 97, 105–06 (explaining that "an inadvertent failure to provide adequate medical care" does not amount to an Eighth Amendment violation); Brown, 2018 WL 6977594, at *14 (finding no Eighth

---

8198093, at *7 (D. Minn. Dec. 16, 2019), report and recommendation adopted by 2020 WL 1169357 (D. Minn. Mar. 11, 2020) (emphasis in original) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 676 (2009)) ("In order to make out a claim under Bivens, Plaintiff 'must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution.'").

18

Amendment violation where "Plaintiff was not ignored, and the alleged fact that there was an error in judgment does not amount to criminal recklessness").

In reference to Defendant Woltman, Plaintiff alleges that she was aware his finger was broken approximately 3 or 4 days after September 24, 2018, because Plaintiff told her that he believed his finger was broken and that he needed medical treatment. (Compl. [Docket No. 1], at 9). Plaintiff further alleges that Defendant Woltman did not notify medical staff of Plaintiff's broken finger, which is supported by an October 31, 2018, medical report which indicates that Plaintiff complained of "pain on ring finger that apparently [Plaintiff] injured a month ago but did not say anything until yesterday." (See, Id.; Exhibits [Docket No. 1-1], at 125).

Based on these allegations, Plaintiff has plausibly alleged that Defendant Woltman had actual knowledge of Plaintiff's broken finger and that she did not act on that knowledge. Nonetheless, Plaintiff has still not stated a claim upon which relief can be granted against Defendant Woltman.

As set forth above, to state a claim for deliberate indifference, Plaintiff must show that he had an objectively serious medical need. See, e.g., Jackson, 756 F.3d at 1065. Moreover, under the subjective prong, Plaintiff must show not only that Defendant Woltman had actual knowledge of Plaintiff's serious medical need, but also that she recklessly disregarded that need. See, e.g., Flores, 689 F.3d at 903; Baez, 2011 WL 4062586, at *4.

Plaintiff does not plausibly allege that his broken finger was an objectively serious medical need. "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Holden, 663 F.3d at 342 (quoting Coleman, 114 F.3d at 784). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an

acute or escalating situation or that [these] delays adversely affected his prognosis.'" Id. (alteration in original) (quoting Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995)).

Plaintiff's finger had not been diagnosed as requiring treatment. Nor was Plaintiff's broken finger so obvious that a layperson would easily recognize that it required a doctor's attention. Plaintiff's hand had been examined by a nurse only 3 or 4 days earlier and his broken finger had not been discovered. (See, Compl. [Docket No. 1], at 8–9; Exhibits [Docket No. 1-1], at 120–22). Despite some discoloration in Plaintiff's hand and finger, the medical report from that examination notes that Plaintiff had full movement and no swelling. (Exhibits [Docket No. 1-1], at 120–22).

Accordingly, Plaintiff has not plausibly alleged that he had an objectively severe medical need when he reported to Defendant Woltman that he thought his finger was broken. See, e.g., Stanko v. Chaffin, No. 5:18-CV-05088-KES, 2020 WL 4430550, at *4 (D.S.D. July 31, 2020) (finding that "a broken finger [wa]s not a serious medical need"); Hall v. Ramsey Cnty., No. 12-1915 (DSD/LIB), 2014 WL 4055368, at *1, 5 (Aug. 14, 2014), aff'd, 801 F.3d 912 (8th Cir. 2015) (finding no objectively serious medical need where the plaintiff "informed [the defendant] that he thought his leg was broken and requested medical treatment", but "despite [the plaintiff's] reports of leg pain, he was able to walk and move with little difficulty, and [the plaintiff] did not appear to [the defendant] to require immediate medical attention"); Duncan v. Owens, No. 05-5066, 2006 WL 1999166, at *4 (W.D. Ark. July 17, 2006) ("A finger in such a condition, broken or not, is not a serious medical condition.").

In addition, Plaintiff does not make any factual allegations that plausibly indicate that the one-month delay in treatment of Plaintiff's finger adversely affected his prognosis. To the contrary, Plaintiff's medical records attached to his Complaint indicate no such adverse effect. (See, Exhibits [Docket No. 1-1], at 120–33). When Plaintiff's finger was examined about a month later on

October 29, 2018, his finger was no longer discolored and there was only mild swelling. (Id. at 123–24). X-rays taken at that time revealed that Plaintiff's finger was broken but healing. (Id. at 125, 128). Medical personnel initially treated Plaintiff's finger conservatively by immobilizing it with tape and a splint, and he received some occupational therapy. (See, e.g., Id. at 126, 128). Only later on November 27, 2018, was Plaintiff referred to orthopedics after it was determined that, despite the treatment he had received, Plaintiff's finger was "[n]ot healing well." (See, Id. at 133).

Plaintiff does generally allege that the delay caused him unnecessary pain. (See, e.g., Compl. [Docket No. 1], at 10). However, "[s]uch generalized arguments are insufficient to show a detrimental effect from the delay." Hall, 2014 WL 4055368, at *5. In addition, during an October 31, 2018, examination of his broken finger, Plaintiff only reported that he was experiencing "some pain" which he "rate[d] 3/10 when trying to move his finger" and that his pain medications "help[ed] to relief [sic] the pain on his finger." (See, Exhibits [Docket No. 1-1], at 125); see also, Baez, 2011 WL 4062586, at *7 (While pain can suffice to meet the substantial harm requirement, not every twinge . . . suffered as a result of delay in medical care is actionable. Rather, the pain must be substantial.").

Therefore, Plaintiff has not plausibly alleged that any delay in treatment caused by Defendant Woltman adversely affected the prognosis of his broken finger. See, e.g., Holden, 663 F.3d at 342; Hall, 2014 WL 4055368, at *5; Duncan, 2006 WL 1999166, at *4 (finding the plaintiff had not shown his broken finger had worsened due to a delay in obtaining treatment where the medical records did not suggest such, and finding that a delay in surgery after diagnosis suggested the condition was not acute or escalating).

Moreover, even if Plaintiff's finger had been an objectively severe medical condition, Plaintiff has not plausibly alleged that Defendant Woltman deliberately disregarded his need for

medical care. As set forth above, whether Defendants Woltman deliberately disregarded Plaintiff's need for medical care is a subjective inquiry and it requires more than mere negligence or even gross negligence. See, Jackson, 756 F.3d at 1065; Flores, 689 F.3d at 903; Estate of Rosenberg, 56 F.3d at 37. "Deliberate indifference is akin to criminal recklessness." Drake, 445 F.3d at 1042.

Plaintiff alleges that Defendant Woltman is a counselor at FMC Rochester, whose responsibilities included assigning rooms to prisoners, conducting investigations, and reviewing and conducting disciplinary charges.[5] (Compl. [Docket No. 1], at 4). Plaintiff further alleges that when Defendant Woltman visited him in her capacity as a DHO investigator inquiring into Olivo's assault allegations, he told Defendant Woltman that he thought his finger was broken and he needed medical help. (Id. at 9). However, as already noted, Plaintiff's broken finger not so obvious that a layperson would easily recognize that it required a doctor's attention. In addition, Plaintiff's allegations clearly indicate that there was a system in place through which he could formally request medical treatment.[6]

Considering Defendant Woltman's responsibilities, the context in which Plaintiff informed Defendant Woltman of his broken finger, that Plaintiff's broken finger did not obviously need a doctor's immediate care, and that there was a system in place through which Plaintiff could request medical treatment without Defendant Woltman's assistance, Plaintiff has failed to plausibly allege that Defendant Woltman failed to report Plaintiff's broken finger with a culpability that was "akin to criminal recklessness." See, Drake, 445 F.3d at 1042. Conversely, Defendant Woltman appears to have acted reasonably because Plaintiff has not alleged any factual basis from which it can be

---

[5] Notably, Plaintiff does not allege that Defendant Woltman is responsible for providing medical care to prisoners, ensuring medical care is provided to prisoners, or notifying medical personnel of prisoners' medical needs. (See, Compl. [Docket No. 1]). Nor does Plaintiff allege that Defendant Woltman had any specialized medical training. (See, Id. at 4–5).

[6] For example, Plaintiff alleges that he "filed numerous requests to be see[n] by the medical department," and the October 29, 2019, medical report indicates Plaintiff was seen after he asked to be evaluated that morning during "segregation sick call rounds." (See, Id. at 10; Exhibits [Docket No. 1-1], at 123).

inferred that Defendant Woltman had any reason whatsoever to suspected that Plaintiff would be unable to obtain medical treatment himself without her assistance. Therefore, even if Plaintiff's finger had been an objectively severe medical condition, Plaintiff has not plausibly alleged that Defendant Woltman deliberately disregarded his need for medical care. See, e.g., Coleman v. Rahija, 114 F.3d 778, 785 (8th Cir. 1997) (quoting Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996) ("[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.").

For the foregoing reasons, Plaintiff has failed to state a claim against Defendant Woltman. See, e.g., Jackson, 756 F.3d at 1065; Flores, 689 F.3d at 903; Holden, 663 F.3d at 342; Coleman, 114 F.3d at 785; Drake, 445 F.3d at 1042; Hall, 2014 WL 4055368, at *5; Baez, 2011 WL 4062586, at *4; Duncan, 2006 WL 1999166, at *4.

Second, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they confiscated his pull-ups, catheters, gloves, and other medical supplies while he was in segregation. (See, Compl. [Docket No. 1], at 15). Plaintiff alleges that as a result, and because he was only allowed limited access to showers, clean blankets, and sheets, he was left to "fill with urine and feces" and to "sleep without anything or to sleep with it . . . full of urine and feces smells." (Id.). However, Plaintiff does not allege the personal involvement or actual knowledge of any Defendant in relation to this alleged deprivation of Plaintiff's medical needs. Indeed, Plaintiff merely alleges that "[w]hile he was kept in administrative detention his pull-ups, catheters, gloves and other medical supplies were confiscated taken away by the lady and male officers on a regular basis." (Id.).

However, Plaintiff's reference to "lady and male officers" does not implicate any named Defendant. (See, Id.). Plaintiff has not alleged any personal involvement or direct participation by any Defendant, and Plaintiff's vague allegations do not plausibly demonstrate that any Defendant had actual knowledge that Plaintiff was being deprived of needed medical supplies. (See, Id.). Because Plaintiff has not plausibly alleged that any Defendant had actual knowledge that Plaintiff was being deprived of medical supplies, Plaintiff has failed to state a deliberate indifference claim against any Defendant. See, e.g., Jackson, 756 F.3d at 1065; Jolly, 205 F.3d at 1096; Ricketts, 2019 WL 8198093, at *7; Baez, 2011 WL 4062586, at *4.

Third, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they did not provide him with surgery on his broken finger before he was transferred to FCI Butner. However, Plaintiff does not assert any allegations of personal involvement by Defendants David Paul, J. Yargus, Mr. Grimsley, Rhonda Woltman, S. Boldt, L. Dohluar, or S. Snyder. (See, Compl. [Docket No. 1]). These Defendants are all non-medical personnel, and Plaintiff does not raise any factual allegations from which it can be inferred that they were directly involved in any decisions related to the treatment of Plaintiff's broken finger. (See, Id.). Moreover, "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists." Holden, 663 F.3d at 343; see also, Webb, 409 Fed. App'x at 36 ("As a non-medical professional, [the warden] is not personally liable for his medical staff's treatment decisions. As such, Plaintiff has failed to state a claim against these Defendants.").

In reference to Dr. Hadaway and Dr. York, Plaintiff generally alleges that they are responsible for ensuring prisoners are provided with medical care and scheduling medical

appointments outside FMC Rochester, such as the recommended surgery on Plaintiff's finger.[7] (Compl. [Docket No. 1], at 6–7). Although it is clear that Plaintiff received medical treatment after it was discovered his finger was broken, Plaintiff alleges that Defendants Dr. Sheila A. Hadaway, DO and Dr. Elaine York, MD were deliberately indifferent to his medical needs because the treatment he received was inadequate.

To state a claim against Dr. Hadaway and Dr. York, Plaintiff must plausibly allege that: (1) he had an objectively serious medical need; and (2) that these defendants were deliberately indifferent to that need. See, e.g., Jackson, 756 F.3d at 1065; Jolly, 205 F.3d at 1096. Even assuming that Plaintiff's broken finger was a serious medical need, on account of it having been previously diagnosed by a physician as requiring treatment, Plaintiff still fails to state a claim because he does not plausibly allege that these Defendants were deliberately indifferent to his medical needs.

"Whether a prison's medical staff deliberately disregarded the needs of an inmate is a fact-intensive inquiry." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) "The inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." Id. "A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care" Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (citations omitted). However, "a prison doctor

---

[7] The Court notes that although Defendant Dr. Elaine York, MD was consistently and directly involved in Plaintiff's medical care, the only factual allegations regarding personal involvement by Defendant Dr. Sheila A. Hadaway, DO are generic, conclusory assertions that she cancelled and interfered with Plaintiff's surgery that was scheduled for December 2018 and did not provide him with said surgery prior to his transfer. (See, Compl. [Docket No. 1]). Notwithstanding the limited and conclusory nature of the factual allegations against Dr. Hadaway, out of an abundance of caution the Court will assume that Plaintiff's factual allegations are sufficient to allege that Dr. Hadaway was personally involved in Plaintiff's medical treatment.

remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997).

Here, Dr. York discovered that Plaintiff's finger was broken for the first time in late October 2018 after Plaintiff asked to have it evaluated during sick call rounds, and X-rays were taken. (See, e.g., Compl. [Docket No. 1], at 10; Exhibits [Docket No. 1-1], at 123–25). Afterwards, Plaintiff began receiving treatment for his broken finger. (See, Exhibits [Docket No. 1-1], at 125–34). Plaintiff does not challenge the adequacy of this treatment. (See, Compl. [Docket No. 1]).

On November 27, 2018, Dr. York noted that Plaintiff's finger was not healing well, and she referred him to orthopedics for further evaluation. (Exhibits [Docket No. 1-1], at 133). On December 6, 2018, Plaintiff's broken finger was evaluated by an orthopedic surgeon who recommended that surgery be performed on Plaintiff's finger by the end of the year. (See, Compl. [Docket No. 1], at 11; see also, Exhibits [Docket No. 1-1], at 139–44). Also on December 6, 2018, Dr. York reviewed the orthopedics evaluation and ordered the surgery. (See, Exhibits [Docket No. 1-1], at 137).

Nonetheless, in late December 2018, Plaintiff's surgery was cancelled. Plaintiff conclusorily asserts that Defendants Dr. Hadaway and Dr. York were deliberately indifferent to his medical needs because they cancelled his scheduled surgery. (See, e.g., Compl. [Docket No. 1], at 6–7, 28). However, the only factual allegations raised in Plaintiff's Complaint on the subject are that after Plaintiff was informed his surgery was cancelled, he asked an unidentified officer why it had been cancelled and by whom, and the unidentified officer "stated that it was way above him who cancelled [Plaintiff's] prescribed left ring [finger] surgery."[8] (Compl. [Docket No. 1], at

---

[8] Plaintiff also includes a December 18, 2018, medical report completed by Dr. York which, without explanation, simply notes: "Orders need changing." (Exhibits [Docket No. 1-1], at 138).

18). Plaintiff's Complaint is devoid of any factual allegations that indicate <u>why</u> his surgery was cancelled in December 2018.

As already set forth, "[d]eliberate indifference is akin to criminal recklessness." <u>Drake</u>, 445 F.3d at 1042. Even assuming that Dr. Hadaway and Dr. York were indeed responsible for cancelling Plaintiff's scheduled surgery, Plaintiff has not raised any factual allegations from which it can be plausibly inferred that these Defendants acted with a culpability that was "akin to criminal recklessness." <u>See</u>, <u>Id.</u> Therefore, Plaintiff has failed to state a claim that Defendants Dr. Sheila A. Hadaway, DO and Dr. Elaine York, MD were deliberately indifferent to his medical needs by cancelling his scheduled surgery.

Following the cancellation of Plaintiff's surgery, Dr. York continued to treat Plaintiff's broken finger. Indeed, on January 9, 2019, Dr. York examined Plaintiff's finger and reported that "[i]t [wa]s the same," as well as, that Plaintiff was "waiting for surgery on it." (Exhibits [Docket No. 1-1], at 149). On February 5, 2019, Plaintiff was transferred to FCI Butner without having had surgery on his finger. Plaintiff conclusorily asserts that Dr. Hadaway and Dr. York were deliberately indifferent to his medical needs because they did not ensure that he received the recommended surgery on his finger before his transfer on February 5, 2019.

However, Plaintiff does not raise any factual allegations from which it can be plausibly inferred that Dr. Hadaway and Dr. York acted with a culpability that was "akin to criminal recklessness" by not ensuring he received surgery sooner. <u>See</u>, <u>Drake</u>, 445 F.3d at 1042. Indeed, it appears that these Defendants were in the process of obtaining surgery for Plaintiff when he was transferred. (<u>See</u>, <u>Id.</u>).

Plaintiff does allege that he requested that Defendants "please provide him with his prescribed surgery before he get[s] his transfer," but the mere fact that Plaintiff would have

preferred to receive surgery on his finger sooner does not establish that Defendants Dr. Hadaway and Dr. York were deliberately indifferent to his needs. See, Scott v. Benson, 742 F.3d 335, 340 (8th Cir. 2014)) (quoting Nelson, 603 F.3d at 449) (alteration in original) ("A 'mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.'"); Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006)) (alterations in original). ("To state a claim based on 'inadequate medical treatment . . . [t]he plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."'").

Therefore, Plaintiff has failed to state a claim against Defendants Dr. Sheila A. Hadaway, DO and Dr. Elaine York, MD. See, Jackson, 756 F.3d at 1065; Drake, 445 F.3d at 1042; Jolly, 205 F.3d at 1096; see also, Allard, 779 F.3d at 772; Scott, 742 F.3d at 340; Nelson, 603 F.3d at 449; Dulany, 132 F.3d at 1240.

Lastly, Plaintiff claims that Defendants were deliberately indifferent to his medical needs when they transferred him from FMC Rochester to FCI Butner. Specifically, Plaintiff contends that his various medical problems require care from a federal medical center, and as a non-medical center, FCI Butner is purportedly not capable of caring for Plaintiff's medical needs. (See, e.g., Compl. [Docket No. 1], at 32). However, Plaintiff only asserts generic, conclusory allegations of personal involvement by any Defendant.[9] Such generic allegations are insufficient to plausibly state a claim that any particular Defendant was deliberately indifferent to Plaintiff's medical needs

---

[9] For example, Plaintiff generically alleges that Defendant Warden David Paul was "in charge of transportation of prisoners," Defendant Rhonda Woltman "filed a separation form against Plaintiff to get rid of him," and Defendants Mr. Grimsley, S. Boldt, and L. Dohluar were "in charge of the . . . transfer." (See, e.g., Compl. [Docket No. 1], at 3–5). In reference to Defendants Dr. Sheila A. Hadaway, DO and Dr. Elaine York, MD, Plaintiff merely alleges that they "failed to prevent the transfer." (See, Id. at 32). Plaintiff does not assert any allegations of personal involvement by Defendants J. Yargus and S. Snyder. (See, Compl. [Docket No. 1]).

by transferring him to FCI Butner. See, e.g., Iqbal, 556 U.S. at 679; Webb, 409 Fed. App'x at 35;

Clemmons, 477 F.3d at 967; Ricketts, 2019 WL 8198093, at *7.

Moreover, even if Plaintiff had alleged personal involvement by a Defendant or Defendants, he would still fail to state a claim. Plaintiff continued to receive care at FCI Butner. Indeed, on February 14, 2020, Plaintiff was seen by the radiology department at FCI Butner, and Plaintiff received additional treatment for his finger and other medical conditions on February 20, 2020, February 26, 2020, March 21, 2019, May 28, 2020, and November 6, 2020. (Exhibits [Docket No. 1-1], at 156–68). In addition, the medical records indicate that FCI Butner medical personnel had access to Plaintiff's medical reports from FMC Rochester, and FCI Butner medical personnel were aware that surgery had been recommended to treat Plaintiff's broken finger. (See, e.g., Id. at 162). To the extent Plaintiff alleges that Defendants transferred him to prevent him from receiving treatment, such allegations are directly contradicted by the fact that his medical records were forwarded to FCI Butner when he was transferred.

Accordingly, Plaintiff does not allege that Defendants denied him medical care by transferring him to FCI Butner. (See, Id.; see also, Compl. [Docket No. 1]). Rather, he alleges that he was entitled to different medical care. (See, Compl. [Docket No. 1]). Namely, to be provided care at a federal medical center. (See, Id.).

"[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson, 603 F.3d at 449 (alterations in original) (quoting Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992)); see also, Baez, 2011 WL 4062586, at *6 ("While Plaintiff may disagree with the medical treatment, a deliberate indifference claim does not arise from a prisoner's mere disagreement with the medical treatment he was given."). In sum, even if Plaintiff had alleged personal involvement by a

Defendant or Defendants in transferring him to FCI Butner, he would have failed to plausibly allege that any such Defendant acted with a culpability that was "akin to criminal recklessness." See, Drake, 445 F.3d at 1042. Therefore, even if Plaintiff had alleged personal involvement by a Defendant or Defendants in transferring him, he would have still failed to state a claim. See, e.g., Scott, 742 F.3d at 340; Nelson, 603 F.3d at 449; Drake, 445 F.3d at 1042; Baez, 2011 WL 4062586, at *6.

For the foregoing reasons, this Court recommends that Plaintiff's Bivens claims alleging deliberate indifference to medical needs be **DISMISSED** for failure to state a claim upon which relief can be granted.

### B.  Plaintiff's FTCA Claims

Under 28 U.S.C. § 1346(b) of the FTCA, the United States Government may be sued as a tortfeasor. Thus, the FTCA provides an express waiver of the federal government's immunity for claims based on certain torts committed by federal actors. United States v. Orleans, 425 U.S. 807, 813 (1976). The purpose of this waiver is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws." Bacon v. United States, 810 F.2d 827, 828 (8th Cir. 1987) (quoting Indian Towing Co. v. United States, 350 U.S. 61, 68–69 (1955)). Under the FTCA, an individual can sue the United States for damages:

> for injury . . . caused by the negligent or wrongful act or omission of any [Government employee] while acting within the scope of his . . . employment, under circumstances where the United States, if a private person, would be liable . . . in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). FTCA claims are subject to, and governed by, the substantive law of the state in which the claim arose. 28 U.S.C. § 1346(b)(1).

Here, Plaintiff alleges the following claims under the FTCA: (1) assault and battery; (2) negligent failure to protect Plaintiff; (3) negligence in conducting the investigation and DHO Hearing related to the assault allegations brought by Olivo against Plaintiff; (4) abuse of process; and (5) negligent failure to provide Plaintiff with adequate medical care.[10] (Compl. [Docket No. 1]). All of Plaintiff's alleged FTCA claims arose in Minnesota. (See, Id.). Therefore, they are governed by Minnesota state law. See, 28 U.S.C. § 1346(b)(1).

### i. Individual Capacity

As already noted, Plaintiff purports to assert claims against the United States, as well as, the individual Defendants in both their individual and official capacities. (Compl. [Docket No. 1]). And the United States is the real party interest in claims brought against the individual Defendants in their official capacities. See, Kentucky v. Graham, 473 U.S. 159, 166 (1985).

The FTCA provides that an individual federal employee cannot be sued for torts committed during the course of his or her employment. See, Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996) ("When someone is injured by a tort committed by an employee of the United States who is acting within the scope of his employment, that employee cannot be sued."). The exclusive legal remedy available to a party who has been injured as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. Id. ("[T]he injured person must sue the United States which is liable in its employee's stead.").

---

[10] The Court notes that Plaintiff's Complaint periodically employs a shotgun-style listing of various legal terms without any explanation or factual embellishment. (See, e.g., Compl. [Docket No. 1], at 23–24). To the extent that any of these listings can be construed as purporting to assert additional claims under the FTCA, the Court finds that these shogun-style, conclusory allegations fail to state a claim upon which relief can be granted. See, e.g., Iqbal, 556 U.S. at 686.

Therefore, this Court recommends that Plaintiff's FTCA claims as asserted against the individual Defendants in their individual capacities be **DISMISSED** for failure to state a claim upon which relief can be granted.

### ii. Exhaustion of Remedies

As set forth above, the United States, as a sovereign power, may be sued only to the extent that it has consented to suit by statute. United States Dept. of Energy v. Ohio, 503 U.S. 607, 615 (1992). The FTCA, 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, serves as the United States' exclusive waiver of sovereign immunity for actions sounding in tort. See, Primeaux v. United States, 181 F.3d 876, 878 (8th Cir. 1999) ("The FTCA is a limited waiver of the federal government's sovereign immunity."), cert. denied, 528 U.S. 1154 (2000). "To bring a claim under the FTCA, a party must fully comply with all of the conditions and requirements prescribed by the Act." Jackson v. Fed. Bureau of Prisons, No. 06–cv–1347 (MJD/RLE), 2007 WL 843839, at *15 (D. Minn. Mar. 16, 2007) (citing Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993), cert. denied, 510 U.S. 1109 (1994)).

The FTCA provides, in relevant part:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a) (emphasis added). The statutory language is clear that a party cannot bring a lawsuit against the United States under the FTCA without first exhausting his or her administrative remedies, namely, by presenting a written claim for relief to "the appropriate Federal agency" and receiving a final denial. See, Duncan v. Dep't of Labor, 313 F.3d 445, 447 (8th Cir. 2002) ("Although the Federal Tort Claims Act creates several exceptions to the United States' sovereign

immunity, it requires the claimant to first 'present[ ] the claim to the appropriate Federal agency.'"); <u>McCoy v. United States</u>, 264 F.3d 792, 794 (8th Cir. 2001) ("An action may not be commenced in federal court under the FTCA unless the plaintiff has first presented his claim to the appropriate federal agency, and that claim has been denied."), <u>cert. denied</u>, 535 U.S. 1053 (2002).

"Presentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant." <u>Bellecourt v. United States</u>, 994 F.2d 427, 430 (8th Cir. 1993); <u>see also</u>, <u>Mader v. United States</u>, 654 F.3d 794, 807 (8th Cir. 2011) ("In accordance with longstanding Supreme Court precedent, § 2675(a) is properly viewed as defining the federal courts' jurisdiction to entertain FTCA suits.").

In the present case, Plaintiff asserts that he presented his FTCA claims by filing an administrative tort claim on July 28, 2019. (Compl. [Docket No. 1], at 3; <u>see also</u>, Exhibits [Docket No. 1-1], at 84–90). Plaintiff further asserts that on November 17, 2019, he received a notice of the final denial of his FTCA claims. (Compl. [Docket No. 1], at 3; <u>see also</u>, Exhibits [Docket No. 1-1], at 93).

Plaintiff's administrative tort claim contained many of the same allegations as his present Complaint regarding the altercation with Olivo, as well as, the investigation and DHO Hearing related to the assault allegations brought by Olivo against Plaintiff. (<u>See</u>, Exhibits [Docket No. 1-1], at 84–90). However, in his administrative tort claim, Plaintiff did not assert that his medical care was inadequate in any way. (<u>See</u>, <u>Id.</u>). Nor did Plaintiff present any of the medical-care-related factual allegations that he now contends support his claim that Defendants negligently failed to provide him with adequate medical care. (<u>See</u>, <u>Id.</u>).

Therefore, Plaintiff did not administratively exhaust his FTCA claims for negligent failure to provide adequate medical care. See, e.g., Stackhouse v. United States, No. 09-839 (PJS/JSM), 2011 WL 820885, at *11 (D. Minn. 2011), report and recommendation adopted by 2011 WL 778969 (D. Minn. Mar. 1, 2011) (finding FTCA claims addressed in an administrative tort claim were exhausted, but FTCA claims not addressed in the administrative claim were not exhausted).

Likewise, to the extent that Plaintiff purports to assert claims against Defendants under the FTCA for assault and battery,[11] Plaintiff did not exhaust his administrative remedies by presenting those claims in his administrative tort claim. (See, Exhibits [Docket No. 1-1], at 84–90).

Accordingly, this Court recommends that Plaintiff's FTCA claims alleging negligent failure to provide adequate medical care, assault, and battery be **DISMISSED** for lack of subject matter jurisdiction.

### iii. Negligent Failure to Protect

Plaintiff alleges that Defendants were negligent in failing to protect him from being assaulted by Olivo. (See, e.g., Compl. [Docket No. 1], at 33–34).

Under Minnesota law, to prevail on a negligence claim, Plaintiff must allege and eventually prove four elements: "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995).

"The existence of a legal duty is, of course, a matter of law, which the court must decide." Cooney v. Hooks, 535 N.W.2d 609, 611 (Minn. 2005). "A duty to protect will be found, however, if (1) there is a special relationship between the parties; and (2) the risk is foreseeable." Bjerke v.

---

[11] Notably, although Plaintiff purports to assert assault and battery claims against Defendants, Plaintiff does not allege that he was actually assaulted by any Defendant. (See, Compl. [Docket No. 1]). Rather, Plaintiff alleges he was assaulted by Olivo. (Id.).

Johnson, 742 N.W.2d 660, 665 (Minn. 2007); accord Teegarden v. Roy, No. 12-2190 (SRN/FLN), 2013 WL 1340727, at *4 (D. Minn. Mar. 15, 2013), report and recommendation adopted by 2013 WL 1340775 (D. Minn. Apr. 3, 2013).

A special relationship exists when a person has "custody of another person under circumstances in which the other person is 'deprived of normal opportunities of self-protection.'" Cooney, 535 N.W.2d at 611 (quoting Harper v. Herman, 499 N.W.2d 472, 474 (Minn. 1992)). Accordingly, "[t]he relationship between prison officials and inmates is considered a special relationship." Teegarden, 2013 WL 1340727, at *4.

"The jailer is not, however, a guarantor of the safety of a prisoner. The jailer's duty to protect an inmate from violence arises when the jailer knows or, in the exercise of reasonable care, should know of the danger of attack." Cooney, 535 N.W.2d at 611. "Prison officials have no duty to protect inmates from violence they could not reasonably anticipate." Cooney v. Hooks, 1994 WL 246083, at *1 (Minn. Ct. App. 1994), aff'd, 535 N.W.2d 609 (Minn. 1995) (citing Flechsig v. United States, 991 F.2d 300, 304 (6th Cir. 1993); Artus v. Petrovsky, 638 F. Supp. 51, 54 (W.D. Mo. 1986)).

A special relationship clearly existed between Plaintiff and Defendants, thus the only issue before this Court is whether Plaintiff plausibly alleged that the attack on Plaintiff by Olivo was foreseeable. The determination of foreseeability, in regard to determining the duty owed in a negligence claim, is a question for the court. See, Domagala v. Rolland, 805 N.W.2d 14, 27 (Minn. 2011) ("Foreseeability of injury is a threshold issue related to duty that is ordinarily properly decided by the court prior to submitting the case to the jury."). "To determine whether an injury was foreseeable, we look to the defendant's conduct and ask whether it was objectively reasonable to expect the specific danger causing the plaintiff's injury." Id. "The test is not whether the precise

nature and manner of the plaintiff's injury was foreseeable, but whether the possibility of an accident was clear to the person of ordinary prudence." Id. (internal quotation marks omitted).

Plaintiff alleges that Olivo had previously put a lock in a sock and assaulted his former cellmate, Edward Collier. (Compl. [Docket No. 1], at 13). Plaintiff further alleges that Defendants were aware of this previous assault perpetrated by Olivo, but still did not provide Plaintiff with protection from Olivo. (See, Id. at 13, 34).

However, Plaintiff does not raise any factual allegations from which this Court can infer that Defendants should have reasonably anticipated that Olivo would assault Plaintiff. (See, Compl. [Docket No. 1]). Plaintiff does not allege that Olivo's assault on Collier was related in any way to Olivo's assault on Plaintiff. (See, Id.). Nor does Plaintiff allege that there were any similar circumstances that may have indicated to Defendants Olivo was a threat to Plaintiff. (See, Id.). Plaintiff does not even provide any indication as to when the alleged prior assault occurred. (See, Id.; see also, Exhibits [Docket No. 1-1], at 74). Because Plaintiff has not raised any factual allegations from which it can plausibly be inferred that Defendants should have reasonably foreseen that Plaintiff would be assaulted by Olivo, Plaintiff has failed to state a claim that Defendants were negligent in failing to protect him. See, e.g., McClendon v. Roy, A19-0528, 2019 WL 6112448, at *6 (Minn. Ct. App. Nov. 18, 2019) ("Because none of the facts alleged indicate that the assault was foreseeable, [the defendant] did not owe a duty to protect appellant.").

Therefore, this Court recommends that Plaintiff's FTCA claims alleging negligent failure to protect be **DISMISSED** for failure to state a claim upon which relief can be granted.

### iv.  Negligent Investigation and DHO Hearing

Plaintiff purports to allege that Defendants were negligent in conducting the investigation and DHO Hearing related to the assault allegations brought by Olivo against Plaintiff. (See, Compl. [Docket No. 1]).

Plaintiff purports to assert that Defendants breached several duties of reasonable care that they owed to him by failing to "provide him a proper procedural hearing and investigation." (See, e.g., Id. at 26). Despite his recitation of the elements of negligence, however, Plaintiff does not assert a cognizable negligence claim. See, Twombly, 550 U.S. at 555 ("[A] formulistic recitation of the elements of a cause of action will not do.").

Plaintiff asserts that he was negligently denied due process, as well as, that he was negligently denied a fair investigation and hearing because Defendants wanted to get rid of him. (See, Compl. [Docket No. 1]).

To the extent that Plaintiff purports to assert that Defendants negligently denied Plaintiff due process, Plaintiff has not stated a cognizable claim.

> The FTCA makes the United States liable to the same extent as a private person would be according to the law of the place where the act occurred. Because "law of the place" refers to state law, and state law cannot provide liability for the violation of a federal constitutional right, constitutional wrongs cannot be remedied through the FTCA.

Elliott v. Wilson, No. 0:15-cv-01908-JNE-KMM, 2017 WL 1185213, at *13 (D. Minn. Jan. 17, 2017), report and recommendation adopted by 2017 WL 1180422 (D. Minn. Mar. 29, 2017) (quoting Russ v. United States, 62 F.3d 201, 204 (7th Cir. 1995)). Plaintiff is merely attempting to reassert his procedural due process claim under the FTCA. Because such a constitutional claim cannot be remedied through the FTCA, Plaintiff has failed to state a claim.

To the extent that Plaintiff purports to assert a negligence claim against Defendants because they allegedly denied Plaintiff a fair investigation and hearing to get rid of him, such assertions are better addressed in the context of Plaintiff's abuse of process claim. Indeed, Plaintiff does not allege that Defendants were negligent, he alleges that they <u>intentionally</u> denied him a fair investigation and hearing for the purpose of having Plaintiff transferred out of FMC Rochester. <u>See</u>, <u>Noske v. Friedberg</u>, 713 N.W.2d 866, 876 (Minn. Ct. App. 2006) (emphasis in original) (quoting <u>Hanson v. Hall</u>, 279 N.W. 227, 229 (Minn. 1938)) ("The very fact that an act is characterized as negligent indicates that harm to another as the result of it was neither foreseen *nor intended,* although a reasonable man would have foreseen danger to others because of it and would have adopted another course of conduct."); <u>see</u> <u>also</u>, <u>Smith v. Johnson</u>, 779 F.3d 867, 871 (8th Cir. 2015) (quotations and citation omitted) ("The theories of negligence and intentional tort are contradictory and mutually exclusive. Accordingly there is generally no claim of negligence that flows from intentionally tortious conduct.").

More importantly, Plaintiff asserts that he would have received less severe sanctions had Defendants given him a proper hearing. (<u>See, e.g.</u>, Compl. [Docket No. 1], at 21, 26–27). For relief, Plaintiff requests, in part, that this Court expunge the sanctions he received after being found guilty of assaulting Olivo. (<u>Id.</u> at 38–39). Plaintiff received sanctions of 27 days disallowance of good conduct time, 30 days loss of commissary, and 30 days loss of phone privileges. (<u>See</u>, Compl. [Docket No. 1], at 26; <u>see also</u>, Exhibits [Docket No. 1-1], at 72).

To the extent that Plaintiff's purported negligent investigation and hearing claims challenge the disallowance of his good time credits, Plaintiff's claims fail because they should have been brought in a habeas petition not a civil action. <u>See, e.g.</u>, <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 500 (1973) ("[W]hen a state prisoner is challenging the very fact or duration of his physical

imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or

a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.");

Schweitzer v. United States, 354 Fed. App'x 601, 602 (3d Cir. 2009) (finding the plaintiff's FTCA

"claims [we]re, in effect collateral attacks on his convictions," and "[s]uch attacks must be brought

via habeas corpus.").

To the extent that Plaintiff's purported negligent investigation and hearing claims seek only

monetary damages, Plaintiff's claims fail because they would necessarily invalidate his loss of

good conduct time. As such, they are barred by Heck v. Humphrey, 512 U.S. 477 (1994).[12] See,

Portley-El v. Brill, 288 F.3d 1063, 1067 (8th Cir. 2002) (quoting Heck, 512 U.S. at 486) ("Because

[the plaintiff] seeks damages for the *imposition* of discipline that included the loss of good time

credits, his damage claim challenges 'harm caused by actions whose unlawfulness would render a

conviction or sentence invalid' and is *Heck*-barred."); Cistrunk v. Johnson, 2009 WL 2766727, at

*6 ("[W]here a prisoner alleges procedural flaws in a disciplinary proceeding, such claims are

barred by Heck, whether for monetary or equitable relief, if those claims necessarily imply the

wrongful deprivation of good-time credit."); see also, Dare v. United States, 264 Fed. App'x 183,

185 (3d Cir. 2008) (finding FTCA claims were barred by Heck); Jones v. Sheilds, 107 Fed. App'x

725, 727 (9th Cir. 2004) (same).

Therefore, this Court recommends that Plaintiff's FTCA claims alleging Defendants were

negligent in conducting the investigation and DHO Hearing be **DISMISSED** for failure to state a

claim upon which relief can be granted.

---

[12] Under Heck, an "action seeking damages for prison discipline that resulted in a loss of good time credits does not arise until the inmate has successfully challenged that discipline through habeas or some other proceeding." See, Cistrunk v. Johnson, No. 08-2203 (DWF/RLE), 2009 WL 2766727, at *6 (D. Minn. Aug. 31, 2009).

### v. Abuse of Process

Plaintiff asserts an FTCA claim against Defendants for the tort of abuse of process in reference to the DHO Hearing related to the assault allegations brought by Olivo against Plaintiff. (Compl. [Docket No. 1]). Specifically, Plaintiff alleges that Defendants conducted the investigation and DHO Hearing "to get rid of him." (See, Id.).

Under Minnesota law, the tort of abuse of process has two elements: (1) "the existence of an ulterior purpose;" and (2) "the act of using the process to accomplish a result not within the scope of the proceedings in which it was issued, whether such result might otherwise be lawfully obtained or not." Pow-Bel Constr. Corp. v. Gondek, 192 N.W.2d 812, 814 (Minn. 1971). "[T]he test is whether the process was used to accomplish an unlawful end for which it was not designed or intended, or to compel a party to do a collateral act which he is not legally required to do." Rosati v. Pine Cnty., No. 18-3120 (MJD/LIB), 2020 WL 2490046, at *13 (D. Minn. May 14, 2020) (alteration in original) (quoting Kittler & Hendelson v. Sheehan Props., Inc., 203 N.W.2d 835, 840 (Minn. 1973)).

Here, Plaintiff alleges that Defendants conducted the investigation and DHO Hearing regarding Olivo's assault allegations for the purpose of having Plaintiff transferred out of FMC Rochester. (Compl. [Docket No. 1]). However, Plaintiff does not raise any factual allegations that support his conclusory assertions as to Defendants ulterior purpose. (See, Id.). To the contrary, "Plaintiff asserts that his transfer summary was done on October 29, 2018, per custody." (Id. at 26). Indeed, Plaintiff repeatedly alleges throughout his Complaint that he was scheduled to be transferred out of FMC Rochester prior to his DHO Hearing regarding Olivo's assault allegations. (See, e.g., Id. at 14, 17, 19, 26). Plaintiff further alleges that various Defendants informed him of his upcoming transfer prior to his DHO Hearing. (See, e.g., Id. at 10–11).

Moreover, Plaintiff's allegations do not plausibly indicate that Defendant's actually used the investigation and DHO Hearing to achieve their purported ulterior purpose of transferring Plaintiff out of FMC Rochester. As previously stated, Plaintiff received sanctions of 27 days disallowance of good conduct time, 30 days loss of commissary, and 30 days loss of phone privileges. (See, Compl. [Docket No. 1], at 26; see also, Exhibits [Docket No. 1-1], at 72). As Plaintiff himself observes, these sanctions did not include "to be transferred to a non medical center." (See, Compl. [Docket No. 1], at 26).

In sum, Plaintiff's factual allegations directly contradict his conclusory abuse of process claim. As such, Plaintiff has not plausibly alleged either element required to state an abuse of process claim. See, e.g., Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 679.

Therefore, this Court recommends that Plaintiff's abuse of process claims under the FTCA be **DISMISSED** for failure to state a claim upon which relief can be granted.

### C.  Plaintiff's Conspiracy Claims

Finally, Plaintiff alleges that he was the subject of a conspiracy by Defendants to have him sent away from FMC Rochester because Plaintiff had filed several administrative complaints against Defendants. (Compl. [Docket No. 1]).

Section 1985 pertains to conspiracies to interfere with civil rights. 42 U.S.C. § 1985. To establish a conspiracy under 42 U.S.C. § 1985, Plaintiff must plead facts demonstrating: "(1) the existence of a conspiracy; (2) that the purpose of the conspiracy was to deprive him of his civil rights; (3) an act in furtherance of the conspiracy; and (4) injury." McDonald v. City of Saint Paul, 679 F.3d 698, 706 (8th Cir. 2012.) "The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based 'invidiously discriminatory animus.'" City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989) (quoting Griffin v.

Breckenridge, 403 U.S. 88, 102 & n.10 (1971)). To state a conspiracy claim under § 1985, Plaintiff must "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." Johnson v. Perdue, 862 F.3d 712, 717–18 (8th Cir. 2017) (quotation omitted); see also, Barstad v. Murray Cnty., 420 F.3d 880, 887 (8th Cir. 2005) ("A conspiracy claim requires evidence of specific facts that show a 'meeting of minds' among conspirators.").

Section 1986 pertains to actions against those who have knowledge of § 1985 conspiracies but neglect to prevent them. 42 U.S.C. § 1986. Thus, to state a claim under § 1986, a plaintiff must first plead a valid § 1985 claim. Lewellen v. Raff, 843 F.2d 1103, 1116 (8th Cir. 1988).

Here, Plaintiff purports to assert claims under 42 U.S.C. § 1985 and § 1986. (See, Compl. [Docket No. 1-1]). However, even in reading Plaintiff's Complaint in the light most favorable to him, Plaintiff has not raised any factual allegations that plausibly support the existence of any conspiracy between Defendants as required to state a claim under § 1985. (See, Compl. [Docket No. 1]). Rather, Plaintiff merely alleges in a conclusory manner that Defendants conspired to have him transferred out of FMC Rochester. (See, Id.). These conclusory allegations are insufficient to plausibly plead the existence of a conspiracy as required to state a claim under § 1985. See, Johnson, 862 F.3d at 718 (finding conclusory allegations of a conspiracy insufficient to state a claim); Ernst v. Hinchliff, 129 F. Supp. 3d 695, 728 (D. Minn. 2015), aff'd, 652 Fed. App'x 479 (8th Cir. 2016) (same).

Moreover, Plaintiff alleges that the individual Defendants are all employed by FMC Rochester. (See, Compl. [Docket No. 1], at 3–7). "[A] government entity or corporation cannot conspire with itself." Habhab v. Hon, 536 F.3d 963, 969 (8th Cir. 2008) (citing Barstad, 420 F.3d at 887). "An exception arises when the agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit." Barstad, 420 F.3d at 887. However, Plaintiff

has not alleged or raised any facts from which it can be inferred that Defendants acted "beyond the scope of their authority or for their own benefit." See, Id. Indeed, Plaintiff specifically alleges that "[t]he Defendants' employees were acting within the scope of his/her office of employment." (Compl. [Docket No. 1], at 25). Accordingly, Plaintiff has further failed to plausibly allege the existence of a conspiracy as required to state a claim under § 1985. See, e.g., Barstad, 420 F.3d at 887; Munt v. Schnell, No. 19-cv-3390 (DWF/ECW); 2020 WL 1695420, at *19 (D. Minn. Jan. 21, 2020), report and recommendation adopted by 2020 WL 968353 (D. Minn. Feb. 28, 2020), appeal docketed (finding no ability to conspire where the defendants were all employees of the Minnesota Department of Corrections).

As noted above, no § 1986 cause of action can proceed without an underlying § 1985 violation. See, e.g., Lewellen, 843 F.2d at 1116; Coleman v. Garber, 800 F.2d 188, 191 (8th Cir. 1986). Because Plaintiff has failed to state a claim based on § 1985 he has also failed to state a claim based on § 1986.

Accordingly, this Court recommends that Plaintiff's conspiracy claims be **DISMISSED** for failure to state a claim upon which relief can be granted.

### III.    Conclusion

Therefore, based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED THAT:**

1.    Plaintiff Noel Davila's IFP Application, [Docket No. 2], is **GRANTED**; and

2.    Plaintiff Davila must pay the unpaid balance of $270.08 of the statutory filing fee for this action in the manner prescribed by 28 U.S.C. § 1915(b)(2), and the Clerk of Court shall provide notice of this requirement to the authorities at the FCI institution where Davila is confined.

Furthermore, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Plaintiff Davila's Complaint, in its entirety, be **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b).

Dated: September 24, 2020                    s/Leo I. Brisbois___
                                             Hon. Leo I. Brisbois
                                             United States Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).